CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
SEP 27 2024
LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BRIDGET D., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:23-cv-00018 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Hon. Thomas T. Cullen |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Bridget D. ("Bridget") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434.[1] Bridget suffers from various disorders, including anemia, hereditary hemorrhagic telangiectasia ("HHT"), and anxiety. On review of her application for DIB, the Commissioner (through an administrative law judge ("ALJ")) decided that, despite her limitations, Bridget could still perform a range of sedentary work, with additional modifications. Bridget, who is proceeding *pro se* in this court, challenges that decision and moves for summary judgment against the Commissioner. In sum, she argues that her attorney told her not to mention anything other than her HHT at the hearing, and that no mention was made of her sleep apnea, narcolepsy or anxiety at the hearing.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

After a thorough review of the record, it is apparent that the ALJ considered all the relevant evidence and that his decision is supported by substantial evidence. Accordingly, his decision will be affirmed.

## I. STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (per curiam) (internal quotation omitted).

But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to past relevant work (if any) based on her residual functional capacity ("RFC"); and, if not, (5) whether she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. PROCEDURAL HISTORY AND RELEVANT EVIDENCE

On June 27, 2018, Bridget filed an application for DIB, alleging disability beginning on June 30, 2015. (*See* R. 391–92.) Her date last insured ("DLI")—the date on which she last met the Act's insurance requirement, which is a predicate requirement to receiving benefits—was December 31, 2018. (R. 17.) The DLI is the date by which she must establish disability to receive benefits. *See* 20 C.F.R. §§ 404.110 & 404.132.

In her application, Bridget alleged disability because of migraines, fibromyalgia, chronic fatigue, depression, anxiety, anemia, sleep disturbance, cervical spine disorder, and "vascular malformation causing intestinal bleeding." (R. 129.) That claim was denied initially and upon reconsideration. (*See* R. 15, 128–46, 149–69.) Bridget requested a hearing on her claim, and on October 17, 2022, she and her attorney appeared before ALJ Brian Rippel for a hearing. (*See* R. 36–68.) On November 22, 2022, the ALJ issued a written decision finding that Bridget was not disabled during the relevant period and denying her claim. (R. 15–29.) This appeal, in which Bridget is now proceeding *pro se*, followed.

**A.     Legal Framework**

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ determines the claimant's RFC between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify

each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the RFC assessment must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion," SSR 96-8p, 1996 WL 374184, at *7, and must logically explain how the ALJ weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311–12. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, and the written decision built an "accurate and logical bridge from the evidence to his [or her] conclusion[s]." *See Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017) (cleaned up); *Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**B.     Relevant Testimony and Medical Evidence**

Because Bridget's argument at this stage only concerns the hearing before the ALJ, and specifically her attorney's representation of her during the hearing, the court will limit its review to Bridget's testimony before the ALJ.

Bridget first testified under questioning from the ALJ, confirming that her last period of employment was in 2015. (R. 41–42.) When her attorney initiated her questions, she noted for Bridget that her questions "are from when [she] stopped working around 2015 until around

2018." (R. 44.) She asked Bridget what was keeping her from working the most, and Bridget discussed the severe depression she had following her father's death in 2015. (R. 44.) She also noted that her anemia, constant migraines, and nosebleeds all contributed to her difficulty working. (R. 45.)

Bridget testified that her depression made her feel "just like a knot on a log" and that she "didn't want to have nothing to do with nobody." (*Id.*) Regarding her migraines, she testified that they "never go away," that "[t]hey're always there. They can get worse throughout the day. Sometimes they'll be there a couple days or a couple weeks, until the doctors have to give [her] medicine to make it go away." (*Id.*) When her attorney asked her to describe a typical migraine, Bridget testified that she didn't "want to hear anything" and didn't "want to be around people." (R. 46.) A typical migraine would be an 8 on the 10-point pain scale, and it would feel like "somebody's beating [her] in the head with a hammer half the time." (*Id.*)

Bridget's attorney also asked her about her nosebleeds, which are caused by her HHT. (R. 46–48.) She explained that she got them 2–3 times per week and, when she did, she often bled so profusely that she would have to get in the shower "just to have somewhere for it to go." (R. 47.) The nosebleeds often left her dizzy, and on at least one occasion, caused her to pass out. (*Id.*) When Bridget discussed her HHT diagnosis, her attorney asked: "And leading up to the diagnosis of the HHT, were you having some problems with the anemia?" (R. 48.) Bridget said yes, explained her anemia, and discussed the treatments she underwent for it, including iron infusions because the iron pills often made her ill. (*Id.*) Her attorney asked her about how the anemia made her feel, and Bridget explained that "[i]t took all the energy [she] had to even just take a couple steps, sometimes." (R. 48–49.) Bridget also discussed, in

response to another question from her attorney, how the anemia affected her daily activities. (R. 49.)

Bridget's attorney then asked her: "Now, do you have any other medical conditions that were affecting you during that time?" (R. 49.) In response, Bridget discussed her fibromyalgia and the associated pain and muscle spasms. (*Id.*)

After a thorough discussion of her illnesses and diagnoses, Bridget's attorney then turned the questioning to how Bridget's illnesses and symptoms affected her work, asking, "[H]ow many days of work do you think you would miss because of your medical conditions in a typical week?" (R. 50.) They discussed why she would miss work, and Bridget said that it could be the nosebleeds or the migraines. (*Id.*) They discussed what she could do—lift, walk, stand, etc.—and Bridget's self-professed need to use a cane on occasion. (R. 50–51.) Bridget's attorney also asked her about the frequency of her doctor's appointments during the relevant time period, "that period of time between 2015 and 2018." (R. 51.) After discussing her treatments her attorney tendered her to the ALJ for questioning.

At the outset, the ALJ asked: "Ma'am, any other problems? Any other symptoms? Anything else that you believe impacted your ability to work since your alleged onset date back in 2015, right up until now? Anything you haven't told me about yet?" (R. 52.) Bridget responded: "I mean, no." (*Id.*) She then followed up, saying that "[t]hey have found other medical conditions wrong with [her] after 2018," but the ALJ directed her to "[a]nything else that was affecting [her] prior to 2018." (R. 53.) Bridget said, "Nothing that I can think of right offhand." (*Id.*)

The ALJ asked Bridget about "any mental or emotional issues" that impacted her work, and Bridget responded that the fibromyalgia and the migraines caused problems "thinking straight" because of the pain. (*Id.*) They discussed Bridget's struggles in a fast-paced working environment, like the call center in which she worked during 2015, and difficult interacting with people. (R. 53–54.) The ALJ asked Bridget about any difficulty "dealing with change," and she responded that she had difficulties and that change makes it hard to remember and makes her "agitated." (R. 54.) The ALJ concluded his questioning by asking, "Ma'am, anything else that you wanted to share with me today that you haven't covered in your testimony?" Bridget responded, "Nothing that I can think of." (R. 54.)

Bridget's attorney then asked some follow-up questions. They discussed Bridget's depression after her father died, how the call center job worked, and Bridget's anxiety while on the job. (R. 54–56.) Her attorney asked her whether she would "get anxious or overwhelmed on those calls," and asked Bridget for an example of such a situation. (R. 56.) She asked Bridget how the situation "affect[ed] [her], either emotionally or mentally," and Bridget said that it "[t]ook all [she] had not to break down and cry most [of] the time." (*Id.*) They discussed her nosebleeds again and how that impacted her work, and then returned to Bridget's anxiety. (R. 57–58.) Bridget said that she "stayed nervous and anxious and irritated . . . all the time," and that she "got to the point [she] didn't want to have to deal with people at all." (R. 58.)

At the conclusion of Bridget's testimony, Nancy Shapero, a vocational expert, testified about work in the national economy and fielded several hypotheticals from the ALJ. (R. 58–66.) At the conclusion of the hearing, Bridget's attorney made brief closing remarks. (R. 66.)

**C.     The ALJ's Opinion**

In a thorough written opinion, the ALJ found that Bridget was insured through December 31, 2018. The ALJ determined that Bridget suffered from anemia, HHT, chronic neck and back pain, chronic pain syndrome, fibromyalgia, migraines, obesity, anxiety disorder, and depressive disorder, all of which qualified as "severe impairments" under 20 C.F.R. § 404.1520(c). (R. 17–18.) The ALJ further noted that through her DLI, Bridget's impairments—either singly or in combination—did not meet or medically equal any of the listed impairments in the applicable regulations. (R. 18); *see* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. After considering the entire record, the ALJ found that Bridget had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) with lifting and/or carrying up to 10 pounds occasionally and less than 10 pounds frequently, standing and/or walking up to 2 hours and sitting up to 6 hours in an 8-hour workday. Additional limitations include: needs the flexibility to use a cane when walking; only occasional climbing ramps or stairs, balancing (as defined in the Selected Characteristics of Occupations), stooping, or crouching; no kneeling, crawling, or climbing ladders, ropes, or scaffolds; only occasional exposure to cold or heat extremes, vibration, or workplace hazards (including unprotected heights and dangerous machinery); cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; only occasional interaction with the public, co-workers, or supervisors; dealing with only occasional changes in a routine work setting; work in a setting no louder than a moderate noise environment (term use is consistent with the examples of moderate noise in the SCO, specifically a business office with typing, a department store, light traffic, or a fast food restaurant at off hours[)].

(R. 21–22.) As a result, the ALJ found that a significant number of jobs exist in the national economy that Bridget can perform (such as addresser, table worker, or patcher), and that

Bridget was not under a disability from the alleged disability onset date—June 30, 2015—through her DLI. (R. 28–29.)

### III.  ANALYSIS

In her one-page *pro se* brief, Bridget makes two primary claims. First, she asserts that, at her hearing before the ALJ, her attorney instructed her not to talk about any of her ailments except her HHT; she claims her attorney told her that, if she did, the hearing "would be terminated and [her] case would be thrown out by the judge." (ECF No. 11.) Second, she complains that, at her hearing, "nothing was said about [her] narcolepsy, sleep apnea, or crippling panic/anxiety attacks." (*Id.*)

Turning first to her issue with the alleged advice from her attorney: if true, such a claim is not grounds to upset the ALJ's decision. An attorney is often called upon to make strategic decisions in representing a client, and advising a client on her testimony often falls into that category. These strategic decisions are often debatable, but allegedly insufficient representation at a hearing before the ALJ is not grounds for reversal under the applicable regulations. *See Helton v. Kijakazi*, No. 2:21cv00015, 2022 WL 3031345, at *6 (W.D. Va. Aug. 1, 2022) (R&R) ("[W]here, as here, the claimant is represented by counsel, the ALJ is entitled to assume that a claimant . . . is making his strongest case for benefits." (cleaned up)), *adopted by* 2022 WL 4003870 (W.D. Va. Sep. 1, 2022). Rather, the determinative question is whether the ALJ's decision is supported by substantial evidence. A thorough review of the record convinces this court that it is.

Insofar as Bridget challenges the scope of the hearing, "[i]t is well-settled that claimants in social security cases are entitled to a full and fair hearing of their claims." *Id.* A claimant is

entitled to a remand when "the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). "Prejudice may be established by showing the ALJ's decision 'might reasonably have been different had [that] evidence been before [him] when [his] decision was rendered." *Helton*, 2022 WL 3031345, at *6 (quoting *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980)). But the duty to "fully and fairly develop the record . . . does not mean the ALJ is required to act as substitute counsel for a claimant." *Id.*

Even a glancing review of the transcript of the hearing establishes that Bridget is simply wrong that her attorney only permitted her to address her HHT or that the ALJ failed to "fully and fairly develop the record." Bridget spoke at length—and in response to direct questions *from her attorney*—about her various maladies. For example, her attorney asked her directly about her specific questions about depression (R. 44–45), her anemia (R. 48–49), and her fibromyalgia (R. 49–50), as well as open-ended questions that would reasonably elicit the responses Bridget now claims she was threatened not to provide (*see, e.g.*, R. 49). And the ALJ asked Bridget specifically if she had "any other problems" or "[a]ny other symptoms . . . that [Bridget] believe[d] impacted [her] ability to work since [her] alleged onset date back in 2015 . . . ." (R. 52.) In response, Bridget tried to discuss "other medical conditions" that she had been diagnosed with after 2018, but the ALJ redirected her to "[a]nything else that was affecting [her] prior to 2018." (R. 52–53.) Cleary, Bridget was comfortable and willing to discuss other issues she had besides her HHT and the ALJ gave her express opportunities to do so; her protestations at this stage are not convincing or supported by the record.

Next, Bridget contends that "nothing was said about [her] narcolepsy, sleep apnea, or crippling panic/anxiety attacks." (ECF No. 11.) As it concerns her anxiety, she is again wrong: Bridget testified about her anxiety and how it affected her performance at her prior jobs. (*See* R. 55–58.) She explained how she would get overwhelmed—"nervous and anxious and irritated"—and that it would affect her pace of work. (R. 58.) Moreover, even if her anxiety was not directly discussed at the hearing, the ALJ certainly considered it; in fact, he found her anxiety to be a severe impairment (*see* R. 17–18) and crafted an RFC that clearly accounted for her anxiety, including limitations such as "occasional interaction with the public, co-workers, or supervisors" and "dealing with only occasional changes in a routine work setting" (R. 21). He also precluded her from working in an environment "requiring a specific production rate such as assembly line work or work that requires hourly quotas." (*Id.*) These limitations were to account for Bridget's severe anxiety (*see* R. 27), and her argument to the contrary is not persuasive.

Regarding her sleep apnea and narcolepsy, although they were not mentioned at the hearing, the ALJ did acknowledge those diagnoses in his written opinion, noting that Bridget "was also treated for obstructive sleep apnea and assessed with narcolepsy after the date last insured." (R. 18; *see also* R. 815 (suggesting obstructive sleep apnea following an at-home sleep study in October 2019); R. 820 (noting "new onset" of narcolepsy in March of 2020); R. 817 (noting Bridget's hypersomnia in 2022).) And although Bridget has been diagnosed with both sleep apnea and narcolepsy/hypersomnia,[2] she had not been diagnosed with either during the

---

[2] "The term 'hypersomnia' broadly refers to sleep disorders that, like narcolepsy, are considered central disorders of hypersomnolence. These disorders share the common symptom of excessive sleepiness or a strong urge to fall asleep during the day." Jay Summer and Dr. Nilong Vyas, *Hypersomnia vs Narcolepsy*,

period in which she was eligible for DIB. (*See* R. 18 ("These impairments did not require any treatment during the period under consideration, therefore they are not severe impairments for the period at issue.").[3] Because her DIL was December 31, 2018, any disabling conditions that she developed thereafter, even if they completely preclude her from work in the national economy, are simply not a basis for an award of disability insurance benefits. The ALJ's failure to award benefits because of Bridget's sleep apnea and hypersomnia, therefore, was not error.

### IV. CONCLUSION

The court has reviewed the remainder of the ALJ's decision and supporting evidence and is satisfied that the decision is supported by substantial evidence. For this and the foregoing reasons, Bridget's motion for summary judgment will be denied, and the Commissioner's decision will be affirmed.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 27th day of September, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

SleepFoundation.org (Dec. 22, 2023), *available at* https://www.sleepfoundation.org/hypersomnia/hypersomnia-vs-narcolepsy (last accessed September 26, 2024).

[3] Similar to Bridget's argument regarding her attorney, the ALJ's recognition and discussion of Bridget's later-diagnosed sleep apnea and narcolepsy/hypersomnia fulfilled his obligation to "fully and fairly develop the record." *Helton*, 2022 WL 3031345, at *6.